**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CHEYENNE LEE, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Case No.: _____ |
| | ) | |
| v. | ) | *Document Electronically Filed* |
| | ) | |
| CITY OF NEW YORK, BRIAN QUERY, | ) | **COMPLAINT AND** |
| MACCIEL RESTITUYO, DAVID PEREZ, | ) | **DEMAND FOR JURY TRIAL** |
| LISSA SOLERMARTE, PRAVEEN DAVIS, | ) | |
| ALEX ALMONTE PICHARDO, JASON | ) | |
| GONZALEZ, DANIEL REISERT, and FLAMUR | ) | |
| GASHI, | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## PRELIMINARY STATEMENT

1.      On December 3, 2021, Plaintiff Cheyenne Lee ("Lee") was at home caring for her teenage nephew and his father, who both require regular assistance, when she heard a knock on the door.  When she opened the door, she was confronted by nine officers (the "Individual Defendants") from the New York City Police Department ("NYPD").  The officers demanded to speak with the nephew and then, without a warrant or consent, barged into the apartment. Once inside, one of the officers—a lieutenant—asked Lee where her nephew was, and she responded that he was in his room. The officers then approached the nephew's room, and three of them drew their tasers, even though the nephew posed no threat.  Lee, hanging back, asked the officers not to tase her "child."  In retaliation, the lieutenant instructed the officers to arrest Lee for obstruction of governmental administration.  The officers did so—and they refused to tell Lee that she was under arrest while handcuffing her, taking her to a squad car outside and driving her to the local precinct.  The officers held her at the precinct and questioned her for hours.  When her blood pressure rose alarmingly, she was brought to a hospital and shackled to a bed there for hours more. After her release, she faced prosecution for months before the District Attorney dismissed the charges.  All this because Lee, a Black woman, asked the police not to tase her Black nephew.

2.      The officers knew they had no legal basis to arrest Lee, so they lied to cover up their misconduct.  In police reports and documents supporting the criminal charges against Lee, the officers falsely wrote that Lee had lied about her nephew's whereabouts and had physically gotten in their way, despite body camera footage in their possession showing she had done neither. Upon information and belief, the officers hoped Lee would plead guilty to the charges—something many people in Lee's position do in order to avoid prolonged prosecution and an uncertain fate in

the often unfair criminal system—because then she would be barred from contesting the constitutionality of the arrest in litigation.

3.      But Lee knew that what had happened to her was wrong, and she refused to plead guilty, standing on principle and understanding the risks that accompanied that stance.  Born and raised in the Bronx, Lee also knew that the kind of police escalation that she and her family had faced can and does lead to serious injury and even death for Black and brown people like them. She now brings this case to hold the police and the City of New York accountable for violating her constitutional rights and in the hopes of stemming unconstitutional and retaliatory police aggression in her community.

## PARTIES

4.      Plaintiff Cheyenne Lee is a woman of Black and Native American ancestry who, at all times relevant herein, has been residing in New York City.  Lee was born and raised in the Bronx.

5.      Defendant City of New York is a municipal entity created and organized under the laws of the State of New York.  The City is authorized by law to maintain the NYPD.  The City's responsibility extends to all NYPD matters including the NYPD's policies, practices, and the conduct of all NYPD personnel including policymakers and employers.

6.      Defendant Brian Query was a Lieutenant assigned to the 42nd Precinct at the time of the incident.  Upon information and belief, Defendant Query has been an officer with the NYPD since January 10, 2005 and has been a Lieutenant since May 29, 2020.

7.      Defendant Macciel Restituyo was a police officer assigned to the 42nd Precinct at the time of the incident.  Upon information and belief, Defendant Restituyo has been an officer with the NYPD since January 3, 2019.

8.      Defendant David Perez was a Sergeant assigned to the 42nd Precinct at the time of the incident.  Upon information and belief, Defendant Perez has been an officer with the NYPD since January 10, 2005 and has been a Sergeant since May 29, 2020.

9.      Defendant Lissa Solermarte was a police officer assigned to the 42nd Precinct at the time of the incident.  Upon information and belief, Defendant Solermarte has been an officer with the NYPD since January 3, 2019.

10.     Defendant Praveen Davis was a police officer assigned to the 42nd Precinct at the time of the incident.  Upon information and belief, Defendant Davis has been an officer with the NYPD since April 25, 2018.

11.     Defendant Alex Almonte Pichardo was a police officer assigned to the 42nd Precinct at the time of the incident.  Upon information and belief, Defendant Almonte Pichardo has been an officer with the NYPD since January 6, 2020.

12.     Defendant Jason Gonzalez was a police officer assigned to the 42nd Precinct at the time of the incident.  Upon information and belief, Defendant Gonzalez has been an officer with the NYPD since January 6, 2020.

13.     Defendant Daniel Reisert was a police officer assigned to the 42nd Precinct at the time of the incident.  Upon information and belief, Defendant Reisert has been an officer with the NYPD since April 28, 2021.

14.     Defendant Flamur Gashi was a police officer assigned to the 42nd Precinct at the time of the incident.  Upon information and belief, Defendant Gashi has been an officer with the NYPD since October 18, 2017.

## JURISDICTION AND VENUE

15.     This action is brought pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the Constitution of the United States and the New York Constitution. Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(a)(3), as this is a civil action arising under the Constitution and laws of the United States.  This Court has supplemental jurisdiction over related state claims under 28 U.S.C. § 1367(a).

16.     Venue is proper pursuant to 28 U.S.C. § 1391(a), (b), and (c) because all of the events giving rise to Plaintiffs' claims occurred in the Southern District of New York.

## COMPLIANCE WITH NEW YORK'S GENERAL MUNICIPAL LAW

17.     On June 25, 2022, Plaintiff served a Notice of Claim upon the City of New York, which timely preserved Lee's claims for malicious prosecution and abuse of process.

18.     On September 14, 2022, Plaintiff was granted leave by the Bronx County Supreme Court to file an amended Notice of Claim, pursuant to N.Y. General Municipal Law § 50-e(5). This amended Notice of Claim included additional state claims, including but not limited to false arrest, negligent infliction of emotional distress, intentional infliction of emotional distress, and assault and battery.

19.     On December 16, 2022, Plaintiff attended a hearing pursuant to N.Y. General Municipal Law § 50-h.  More than thirty days have elapsed since Plaintiff served a Notice of Claim, and the City has not offered adjustment or payment thereof.

## STATEMENT OF FACTS

**I.      The Unlawful Entry into Lee's Apartment and Junior's Room**

20.     In the months prior to December 2021, Lee resided at an apartment with her nephew Pedro Perez Junior ("Junior") and his father Pedro Perez Senior ("Pedro"), sleeping and spending

significant time at their shared third-floor apartment in the Bronx.  Pedro cannot read or write, and Junior—a teenager—has a mental health condition.  Lee lived with Pedro and Junior and helped them to manage their household, including daily tasks like grocery shopping, cooking, paying bills, and assisting with Junior's education.  Lee stored personal items at the shared apartment.  She had her own key, and as of December 3, 2021, she had her own bedroom to sleep in at the apartment.

21.     On the night of December 3, 2021, Lee, Pedro, Junior, and a friend of Junior's were at home.  Pedro and Junior had an argument, and Pedro left the apartment.  Soon after, a neighbor on the sixth floor called 911 and said that Pedro "just came up because his son is beating him." The neighbor reported that Pedro had already gone back to his apartment, that he did not need an ambulance, and that there were no weapons involved.  She further indicated that she was not present during the incident itself.

22.     Defendants Query, Restituyo, Perez, Solermarte, Davis, Almonte Pichardo, Gonzalez, Reisert, and Gashi—nine officers in total—responded to the call.  As a lieutenant, Defendant Query was the highest-ranking officer on the scene.

23.     All nine officers met in the lobby of the apartment building and then made their way to the third floor.  They did not have arrest or search warrants.

24.     Defendants Perez and Gashi knocked on the door of Lee's apartment.  Before Lee opened the door, Pedro walked up to the apartment from the hallway outside.

25.     Defendant Perez asked Pedro whether he lived in the apartment, and Pedro replied that he did.  Pedro then opened the apartment door with his own key, just as Lee was opening the door from inside the apartment.  Pedro walked through the apartment door, and Defendant Perez followed him inside.

26.     At no time did Defendant Perez request permission from anyone in the apartment to enter.  Neither Pedro nor Lee had invited him in.

27.     Defendant Perez asked Pedro and Lee whether they had called 911, and both Pedro and Lee said no.  Defendant Perez asked who lived in the apartment, and Lee responded that she, Pedro, and Junior did.  Defendant Perez told Pedro and Lee that they had received an emergency call to the apartment.

28.     While the apartment door was open, Defendant Restituyo spoke on the phone in the hallway with the neighbor who had called 911.  Defendant Restituyo confirmed that the 911 caller was on the sixth floor.  Defendant Perez apologized to Lee and left the apartment.  Lee closed the door.

29.     Seven of the Individual Defendants, specifically, Defendants Query, Perez, Gashi, Restituyo, Solermarte, Almonte Pichardo, and Gonzalez, left to go to the sixth floor—to the apartment of the neighbor who made the call.  Defendant Restituyo stated that someone needed to stay at Lee's apartment "just in case."  Defendants Reisert and Davis remained outside Lee's apartment in the hallway.

30.     On the sixth floor, the neighbor who had made the call informed the officers that Pedro had come up to her apartment and that she had decided to call 911 after speaking with him.  Upon information and belief, during their conversation with the neighbor, the officers concluded that Pedro, the man who had opened the door to the third-floor apartment, was the subject of the neighbor's call.

31.     Defendant Gashi informed the neighbor that, if Pedro was not cooperative, "there is only so much we can do."  Defendant Perez also told her that if Pedro denied that anything happened when speaking to the Individual Defendants, they "can't take any action."

7

32.     The neighbor told Defendants Gashi and Perez that Lee's apartment was "all beat up" because of Junior.  Defendant Gashi then asked the neighbor, "What's wrong with the son?" She responded, "He's bipolar."

33.     The seven Individual Defendants who had gone up to the sixth floor then returned to the third floor and joined Defendants Reisert and Davis outside Lee's apartment.

34.     Defendant Query—the lieutenant—knocked on the door of Lee's apartment, and Lee opened the door.

35.     Defendant Query saw Pedro in the apartment, pointed at him, and yelled for him to come over.

36.     Pedro walked out of the apartment and, in the hallway, had a conversation with Defendant Query in Spanish.

37.     Defendant Query asked Pedro what had happened between him and Junior and requested that Pedro show Defendant Query his injuries.

38.     Pedro repeatedly told Defendant Query that he was fine and that he was cleaning, gesturing through the open door to Lee, who was cleaning in the apartment.

39.     Defendant Query asked Pedro whether the person who hit him was in the apartment.

40.     Pedro responded, "No, no, my son, my friend. Like this. I'm good."

41.     Defendant Query told Pedro that someone called 911 saying Pedro had been assaulted.

42.     Pedro again responded that he was fine and that everything was fine.

43.     Defendant Query, without asking anyone in the apartment for permission, entered the apartment and asked Lee, who was standing by the doorway, where Junior was.

44.     Lee responded that Junior was "in his room, probably" with his friend, and she gestured toward a room in the apartment.  At no time did Lee state that Junior was not in the apartment or that he was outside the apartment.

45.     The other eight Individual Defendants, who had been waiting outside in the hallway, began to follow Defendant Query into the apartment.

46.     Lee, who was still standing by the doorway, asked why the officers were all coming into the apartment.

47.     Defendant Query responded to Lee, "Miss, no.  I'm the lieutenant.  I have to come in."

48.     Lee replied, "All of you all can't come in, I didn't even let you all come in though."

49.     Pursuant to NYPD Operations Order No. 50, if an officer seeks to search a premises through consent, the officer must ask specific questions to ensure that the person has full knowledge of their rights.[1]  The person must understand that they are providing consent for the officer to enter, and the officer must elicit a clear "yes" or "no" response.  This response must generally be documented on a "Consent to Search" form, numbered PD541-030.  If consent is withdrawn prior to the completion of the search, the officer must immediately cease the search.

50.     The Individual Defendants did not follow the procedure outlined in Operations Order No. 50.

51.     The Individual Defendants did not ask for consent to enter or search the apartment.

---

[1] NYPD Operations Order No. 50, *Consent to Search Guidelines for Uniformed Members of the Service Assigned to the Detective Bureau and Other Investigatory Commands/Units* (Oct. 11, 2016), https://www.nyc.gov/assets/ccrb/downloads/pdf/investigations_pdf/oo_50_16.pdf.

52.     The Individual Defendants did not elicit a clear "yes" or "no" response to entry from Lee, Pedro, or any resident of the apartment, nor did they ask Lee, Pedro, or any resident of the apartment to sign a "Consent to Enter" form.

53.     The Individual Defendants did not cease their entry when Lee objected and instead continued walking into the apartment.

54.     Lee did not physically attempt to stop their entry in any way.

55.     After entering the apartment, Defendants Query, Almonte Pichardo, Rodriguez, and Restituyo walked by the room that Lee had indicated Junior was in, without entering that room.

56.     Defendant Solermarte stopped at the entryway to the room, shone her flashlight through the crack in the door, and saw Junior standing there.

57.     Defendants Solermarte, Query, and Restituyo all drew their tasers while commanding Junior to come out from behind the door.

58.     Upon information and belief, when the officers drew tasers and moved to arrest Junior, they lacked probable cause to believe that Junior had committed a crime.  The only information the officers had suggesting that Junior may have committed a crime was the 911 call from the sixth-floor neighbor, and any suspicions they may have had arising from the call were lessened by evidence the officers obtained at the scene, including repeated statements from the alleged victim—Pedro—that he was fine, and the officers observing Pedro voluntarily walking in and out of the apartment.  And, as previously pleaded, the Individual Defendants had no arrest warrant.

59.     Lee, who was still standing near the doorway to Junior's room and behind the officers, said, "Relax, relax," and informed the officers that Junior did not have any weapons.

60.     Defendants Query, Restituyo, Solermarte, Reisert, Gonzalez, Almonte Pichardo, Gashi, and Perez entered Junior's room.

61.     Numerous Individual Defendants then tackled Junior to the bed and placed him in handcuffs.

62.     From the entrance of Junior's room, Lee said "Do not tase him."  Lee's heart began to race.  She was terrified that the Individual Defendants would seriously hurt or kill Junior.

63.     At this time and throughout, Lee was not standing between Junior and any Defendant who was arresting Junior.

64.     During Junior's arrest, Defendant Restituyo screamed at Lee to leave Junior's room.  Defendant Perez put his hands on her shoulders, and Lee moved backward while Defendant Perez's hands were on her.

65.     At no time did Lee resist Defendant Perez, and she followed Defendant Restituyo's instructions to step out.

66.     As she was moving backwards, Lee asked, "How you going to scream at me to get out when y'all in my house?"  From outside the room, Lee stated, "You're about to tase my child for no reason."  Lee walked down the hallway toward the front door, where Pedro and Defendant Davis were standing.

67.     Defendant Gonzalez, with assistance from Defendant Reisert, removed Junior from the room and the apartment.

68.     Some Individual Defendants, including Defendants Query, Solermarte, and Restituyo, searched Junior's room, including the closet, with flashlights.

69.     Lee entered Junior's room and said to Individual Defendants, "I don't understand.  Why are you all searching the room for?  There's nothing in here.  We don't have no weapon."

70.     The Individual Defendants then stopped their search of Junior's room, and Defendants Solermarte and Almonte Pichardo left the room.

71.     Lee did not obstruct any of the Individual Defendants' movements throughout the room or in the hallway.  Lee did not tell the Individual Defendants that they could not leave the room.

**II.      The False Arrest and Malicious Prosecution of Lee**

72.     Defendant Query—the lieutenant—was in the room with Lee and asked who she was.

73.     Lee responded she was Junior's aunt.

74.     Defendant Query accused Lee of having said earlier that Junior was not in the home.

75.     Lee had in fact said Junior was in his room and had never said that Junior was not home.

76.     Following Defendant Query, Defendant Restituyo then also accused Lee of lying.

77.     Lee denied that she had lied.  Lee further stated that she had never told the officers that Junior was not in the home.

78.     Defendant Query, while looking at Defendant Restituyo, pointed at Lee and stated, "OGA."

79.     "OGA" is a commonly used acronym for the misdemeanor of obstruction of governmental administration.

80.     Defendant Restituyo looked at Lee and asked, "Her too?"

81.     Defendant Query said, "Yeah."

82.     Defendants Restituyo and Query each grabbed one of Lee's arms and took her out of the room.

83.     Defendant Query went to the front door, which had closed when the other officers had left the apartment with Junior.  Defendant Query opened the front door and said, "We got one more!  She's going too.  OGA.  OGA."

84.     NYPD officers use arrests as retaliation.  For example, between January 2015 and December 2021, the CCRB, which investigates complaints by the public against NYPD officers, received 86 complaints of retaliatory arrests and substantiated 61 of these complaints.  In 2021, the New York Attorney General sought to hold the City liable for retaliatory arrests of peaceful protestors that occurred in connection with 17 protests between May and December 2020.[2]

85.     Upon information and belief, NYPD officers often use charges like "OGA" to engage in retaliatory arrests.

86.     While being taken from her apartment, Lee repeatedly asked, "Are you arresting me?  Why are you arresting me?"

87.     Despite several officers being present and Defendants Query and Restituyo physically removing Lee from the apartment, no one answered Lee or told her that she was under arrest.

88.     Near the front door, Defendant Restituyo, with the assistance of Defendant Reisert, handcuffed Lee's arms behind her back and accused Lee of lying.

89.     Lee repeated, "I said he was here.  I never said he wasn't here."

90.     Near the front door, Defendant Query told Lee, "All right, listen, this is what's going to happen.  When I get to the base, I'm going to run you.  If you're clean, I'll let you go."

---

[2] Complaint ¶ 1, *People v. City of New York*, No. 1:21-cv-00322 (S.D.N.Y. Jan. 14, 2021), ECF No. 1.

91.     Upon information and belief, NYPD officers often use the term "run" to mean they will run the person's name through a police database in search of outstanding warrants or other alerts that might provide a basis for arrest.

92.     Upon information and belief, Lieutenant Query was extending Lee's detention to conduct a warrant search and find a basis for her arrest. Extending a detention for the purpose of conducting a warrant search is improper, especially where, as here, the detention itself was not lawful. Upon information and belief, Lieutenant Query would have known this.

93.     Prior to leaving the apartment, Lee asked the Individual Defendants to give her a coat, as it was a cold December night.

94.     Defendant Gashi placed a coat on Lee's head but refused to unshackle Lee's hands to allow her to wear it.

95.     Lee also stated, repeatedly, that she had asthma.

96.     The Individual Defendants took no steps to ensure that Lee had the required medications, including her asthma pump, before removing her from her apartment.  Lee felt like she could not ask Individual Defendants for the medication because they appeared reluctant to get her coat.

97.     After Lee had been brought out of the apartment, Defendant Perez remarked to Defendant Gashi, "That escalated quickly."

98.     Defendants Gashi and Reisert brought Lee down the stairs, and Defendants Reisert and Almonte Pichardo brought Lee outside to the front of the apartment building.

99.     In front of the apartment building, Defendant Query again stated that, when they got to the precinct, he would "run" Lee's name and then "decide what [he was] going to do with" her.

100.     At no time did the Individual Defendants inform Lee that she had the right to remain silent or provide her with any other Miranda warnings.  None of the Individual Defendants explained that Lee was under arrest, nor did they explain the charges to her.

101.     Defendants Gonzalez and Almonte Pichardo placed Lee in a police car.  Defendants Gonzalez and Almonte Pichardo drove Lee from the apartment building to the 42nd Precinct.

102.     Lee was handcuffed during this ride to the precinct.  The handcuffs were too tight and caused Lee physical pain and bruising.

103.     Defendants Gonzalez and Almonte Pichardo did not buckle Lee's seatbelt for this ride.

104.     The Individual Defendants documented Lee's arrest as occurring at 9:35 p.m. on December 3, 2021.

105.     There was no probable cause for Lee's arrest.

106.     Lee felt as if the Individual Defendants were kidnapping her.

107.     The Individual Defendants arrived at the precinct with Lee at 9:42 p.m.  Once at the precinct, the Individual Defendants fingerprinted and searched Lee.

108.     The Individual Defendants ran a warrant check on Lee's name at 10:25 p.m.  This warrant check returned no results.

109.     NYPD Patrol Guide Procedures 208-03 and 208-15 require the arresting officer to prepare an arrest worksheet, provide it to the district attorney, and prepare an affidavit for the district attorney.

110.     The Individual Defendants prepared an arrest report pursuant to NYPD Patrol Guide Procedures 208-03 and 208-15.  The arrest report identified Defendant Restituyo as the

arresting officer and the officer who entered the arrest report into the system, Defendant Solermarte as an assisting officer, and Defendant Perez as the supervisor approving the arrest report.

111.    In this arrest report, the Individual Defendants made demonstrably false statements. These statements included:

     a.    Lee "did lie" to the officers;

     b.    Lee "did intent [sic] to interfere with" the officers' investigation;

     c.    Lee "refused to follow lawful orders instructed" by the officers.

112.    Upon information and belief, the Individual Defendants provided the arrest report worksheet containing the false statements to the district attorney.

113.    Upon information and belief, the Individual Defendants did so in order to begin the prosecution of Lee.

114.    The Individual Defendants locked Lee in a cell at the precinct. The cell was freezing, and the floor was cold and dirty.

115.    Lee stood there for hours and began to cough violently.  Lee's bones began to ache. She began to feel as if she could not breathe.  In Lee's experience, her asthma can be triggered by the cold.

116.    When she had first arrived at the precinct, Lee had given her mother's address in the Bronx as her mailing address.  Separate NYPD employees took Lee to an interrogation room to question her about her mother's address, suggesting to her that there was criminal activity occurring in her mother's building.

117.    After the interrogation, Lee was brought back to the cell at the precinct, where she remained for hours overnight.  During that time, Lee's medical condition worsened, and she told officers at the precinct that she did not feel well.

118.    The next morning, on December 4, 2021, NYPD officers brought Lee to central booking.  Throughout the entirety of the trip, Lee was handcuffed.

119.    Upon arriving at central booking, Lee met a nurse who took her blood pressure. Based on Lee's elevated blood pressure, the nurse informed Lee that she needed to go to the hospital.

120.    After meeting with the nurse, an officer attempted to put handcuffs on Lee, but she could not bend her arm, as it had stiffened.  The officer attempted to manipulate Lee's arm in his effort to handcuff her, and Lee cried out in pain in response.

121.    Unidentified NYPD officers brought Lee from central booking to Lincoln Hospital.

122.    Lee remained at the hospital for roughly seven hours and was shackled the entire time.

123.    One NYPD officer remained with Lee while she was hospitalized.  This officer fell asleep during Lee's hospitalization.

124.    While at Lincoln Hospital, Lee could not stop shivering.  The shivering was so severe that hospital staff had difficulty performing medical procedures, including an EKG.

125.    At Lincoln Hospital, Lee was prescribed an asthma pump, then was discharged. The NYPD officer made no attempt to fulfill the prescription for the asthma pump.

126.    After the hospital discharged Lee, NYPD officers brought her back to central booking.  There, Lee was held for another night.

127.    By the time she arrived at central booking, Lee had bruises all over her arms from being handcuffed and shackled for so long.

128.    Lee was arraigned the next day, on December 5, 2021, on the sole charge of N.Y.P.L. § 195.05, Obstruction of Governmental Administration in the Second Degree.  The judge released Lee on her own recognizance.

129.    In support of the charges, prosecutors presented a criminal complaint signed by Defendant Restituyo on December 4, 2021, at 6:02 p.m. that contained multiple demonstrably false statements.  These false statements included that:

   a.   When Lee initially responded to the officers' knock on the door, Lee had said, "It's just me and my nephew."

   b.   When officers later asked Lee where Junior was, Lee had said, "I don't know what's happening.  I don't want to get involved.  My nephew isn't here."

   c.   Lee had "positioned her body in between her nephew and [Restituyo], thereby preventing [Restituyo] from handcuffing [Lee]'s nephew."

   d.   Lee had "stood in front of a door at said location thereby preventing [Restituyo] from exiting said location and refused to comply with [Restituyo]'s requests that [Lee] stop impeding [Restituyo]'s exit."

130.    Upon information and belief, the false statements contained in the criminal complaint contributed to the continued prosecution of Lee.

131.    When Defendant Restituyo signed the criminal complaint containing these false statements, the Defendants had body-camera footage in their possession that directly contradicted statements contained in the criminal complaint and that depicted the true events of the night of December 3.

132.    On December 8, 2021, five days after Lee's arrest and four days after Defendant Restituyo signed the criminal complaint, the Bronx District Attorney's Office turned over the body-camera footage to Lee's criminal attorney.

133.    Despite the inconsistency between the contents of the body-camera footage and the statements in the criminal complaint, Defendants continued prosecuting Lee.

134.    After Lee was released from NYPD custody, she was required to return to court for multiple additional court dates as Defendants continued prosecution.  Lee appeared on at least four subsequent court dates, including on or about February 16, 2022; March 10, 2022; April 13, 2022; and May 18, 2022.

135.    At one point, the prosecutor offered Lee a plea to an Adjournment in Contemplation of Dismissal.  Lee rejected the offer, understanding that doing so could prolong the proceedings and that she could face jail time if she were to lose at trial.  Knowing these risks, Lee took a principled stance against pleading guilty to a crime she had not committed.

136.    On May 18, 2022, the case was dismissed "in the furtherance of justice," pursuant to N.Y. C.P.L. § 170.40.

### III.        The Effect of the Arrest and Prosecution on Lee

137.    Defendants' actions on December 3, 2021 have caused Lee physical, psychological, and emotional injuries.

138.    Lee suffered physical injuries during her time in NYPD's custody, including pain from handcuffs that were too tight during her transport, high blood pressure, and wounds from being handcuffed to a hospital bed.

139.    Since the arrest, Lee has suffered psychological and emotional distress.  Since the arrest, Lee has not felt safe.  Lee has closed herself off from her friends, who have noticed that she

is more downcast and nervous than before the incident.  Lee does not spend significant time outside of her apartment.

140.    Lee fears that she will be caught in a situation where the police arrive.  She worries that the police will not listen to her if she is ever in a similar situation.  Lee no longer defends herself and feels like she can no longer express herself.  She feels like she can no longer say if anything bothers her or does not feel right.  Lee feels like she could be arrested, even if the police are wrong and even if there are many witnesses, because all the witnesses to her previous arrest did not stop it from happening.

141.    Lee struggles to sleep at night, and then she will sleep much of the day. She has had trouble taking care of herself. When she thinks about what happened, Lee gets hot, her palms begin to sweat, and her heart races.  She sees white dots in her line of vision, which is a sign to her that her blood pressure is rising.  She frequently feels anxious, in a way that she did not before she was arrested.

142.    She has traumatic associations with the apartment and neighborhood where she previously lived.  After the incident, Lee did not want to spend time at the third-floor apartment, including no longer wanting to stay the night.  Being in the apartment causes Lee to repeatedly recall the events of the evening of December 3, 2021.  Because of these negative memories, Lee has avoided the apartment, not going back to it for at least six months after the incident, and rarely spending time there since.

143.    Being in New York City at all causes Lee to remember the night of her arrest.  Lee often leaves New York to escape the negative emotions and traumatic associations she now carries following the arrest.

144.   Prior to her arrest, Lee ran her own business as an independent stylist.  In this capacity, Lee styled physical spaces, such as stores, for clients.  After her arrest, and as a product of the emotional trauma inflicted by Defendants over the course of her arrest, Lee has lost energy and motivation to pursue the types of major design jobs she had previously taken on as an independent stylist.  As a result of this, Lee has lost income from those major design jobs.  The smaller scale work she has been able to undertake, such as doing hair, makeup, and nails, pays much less and has caused a significant reduction in her income.

## CLAIMS

### Count One: Retaliation (First Amendment)
42 U.S.C. § 1983
*Against the Individual Defendants*

145.   Plaintiff repeats and realleges paragraphs 1 through 144, as if fully set forth herein.

146.   The Individual Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of 42 U.S.C. § 1983 because they are commissioned by the City of New York to exercise police powers.

147.   Plaintiff engaged in constitutionally protected speech in her own home and in response to an unlawful and warrantless entry and trespass of Office Defendants into her home. There was no probable cause or other legal justification for Office Defendants' entry.

148.   The Individual Defendants retaliated against Plaintiff for engaging in protected speech by subjecting her to, *inter alia*, a false arrest, fabricating evidence, abuse of process, and malicious prosecution, all while lacking a warrant or any probable cause.

149.   The Individual Defendants' actions were intended to prevent Plaintiff from continuing to engage in such protected speech and to discourage her from engaging in similar protected conduct in the future.  The Individual Defendants' actions, in fact, chilled Plaintiff's

speech on the date of and after the incident, and she further suffered other adverse effects and concrete harms following the incident.

150.    The Individual Defendants' retaliatory conduct was objectively unreasonable and violated Plaintiff's right to free speech under the First and Fourteenth Amendments of the U.S. Constitution.

151.    The Individual Defendants acted intentionally, with malice and knowing disregard for Plaintiff's constitutional rights, in retaliating against her for protected speech.

152.    The Individual Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including loss of liberty, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.  Accordingly, Plaintiff is entitled to compensatory damages.

<u>**Count Two: False Arrest (Fourth Amendment)**</u>
42 U.S.C. § 1983
*Against the Individual Defendants*

153.    Plaintiff repeats and realleges paragraphs 1 through 152, as if fully set forth herein.

154.    The Individual Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of 42 U.S.C. § 1983 because they are commissioned by the City of New York to exercise police powers.

155.    The Individual Defendants acted intentionally, with malice and knowing disregard for Plaintiff's constitutional rights, in falsely detaining, arresting, and imprisoning her against her will.  Plaintiff was conscious of, and at no point consented to, the confinement by the Individual Defendants.

156.    The actions of the Individual Defendants in falsely detaining, arresting, and imprisoning Plaintiff without warrant, reasonable suspicion or probable cause violated Plaintiff's

Fourth Amendment rights to be free from unreasonable search and seizure, pursuant to 42 U.S.C. § 1983.

157.   The Individual Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.   Accordingly, Plaintiff is entitled to compensatory and punitive damages.

### Count Three: Illegal Search (Fourth Amendment)
42 U.S.C. § 1983
*Against the Individual Defendants*

158.   Plaintiff repeats and realleges paragraphs 1 through 157, as if fully set forth herein.

159.   The Individual Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of 42 U.S.C. § 1983 because they are commissioned by the City of New York to exercise police powers.

160.   Without a warrant, probable cause, or legal justification, the Individual Defendants engaged in an unlawful search of Plaintiff's home, including by entering the bedrooms and looking through personal belongings in closets.   At no point did Plaintiff consent to the search.

161.   The Individual Defendants acted intentionally, with malice and knowing disregard for Plaintiff's constitutional rights, in conducting an unjustified search of her home.

162.   The Individual Defendants' conduct was objectively unreasonable and violated Plaintiff's Fourth Amendment rights under the U.S. Constitution.

163.   The Individual Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including pain,

suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

### Count Four: Fabricated Evidence (Fourteenth Amendment)
42 U.S.C. § 1983
*Against the Individual Defendants*

164.    Plaintiff repeats and realleges paragraphs 1 through 163, as if fully set forth herein.

165.    The Individual Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of 42 U.S.C. § 1983 because they are commissioned by the City of New York to exercise police powers.

166.    The Individual Defendants, while acting in an investigating capacity, fabricated evidence of a material nature likely to influence a jury's decision, intentionally provided fabricated evidence to prosecutors, and as a result, Plaintiff suffered a number of injuries set forth herein, including deprivation of her liberty.

167.    The Individual Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

### Count Five: Malicious Prosecution (Fourth Amendment)
42 U.S.C. § 1983
*Against the Individual Defendants*

168.    Plaintiff repeats and realleges paragraphs 1 through 167, as if fully set forth herein.

169.    The Individual Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of 42 U.S.C. § 1983 because they are commissioned by the City of New York to exercise police powers.

170.     The Individual Defendants pressed charges against Plaintiff, while knowing the charges were baseless and lacked probable cause.  The proceedings were subsequently terminated in Plaintiff's favor, in a manner indicative of innocence.

171.     Statements made by the Individual Defendants to justify the charges against Plaintiff were made with the knowledge that those statements were false.  The Individual Defendants acted intentionally with malice and knowing disregard for Plaintiff's constitutional rights.

172.     The Individual Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, including a loss of liberty, and of damages including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

## Count Six: Failure to Intervene (First Amendment)
42 U.S.C. § 1983
*Against the Individual Defendants*

173.     Plaintiff repeats and realleges paragraphs 1 through 172, as if fully set forth herein.

174.     The Individual Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned by the City of New York to exercise police powers.

175.     During the events set forth in this Complaint and to the extent they did not participate in the retaliatory arrest of Plaintiff, the Individual Defendants stood by during the false, retaliatory arrest and deprivation of Plaintiff's constitutional and state law rights and did not intervene to prevent those violations despite having the opportunity and duty to do so.

176. The Individual Defendants acted intentionally with malice and knowing disregard for Plaintiff's constitutional rights.

177. Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including loss of liberty, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above. Accordingly, Plaintiff is entitled to compensatory and punitive damages.

**Count Seven: Failure to Intervene (Fourth Amendment)**
42 U.S.C. § 1983
*Against the Individual Defendants*

178. Plaintiff repeats and realleges paragraphs 1 through 177, as if fully set forth herein.

179. The Individual Defendants were at all relevant times state actors and persons acting under color of state law within the meaning of Section 1983 because they are commissioned by the City of New York to exercise police powers.

180. During the events set forth in this Complaint and to the extent they did not participate in the false arrest of Plaintiff, the Individual Defendants stood by during the false arrest and deprivation of Plaintiff's constitutional and state law rights and did not intervene to prevent those violations despite having the opportunity and duty to do so.

181. The Individual Defendants acted intentionally with malice and knowing disregard for Plaintiff's constitutional rights.

182. Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including loss of liberty, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above. Accordingly, Plaintiff is entitled to compensatory and punitive damages.

**Count Eight: False Arrest Under State Law**
*Against the City as respondeat superior, and the Individual Defendants*

183.    Plaintiff repeats and realleges paragraphs 1 through 182, as if fully set forth herein.

184.    The Individual Defendants acted intentionally, with malice and knowing disregard for Plaintiff's rights under New York state law, in falsely detaining, arresting, and imprisoning her against her will.  Plaintiff was conscious of, and at no point consented to, the confinement by the Individual Defendants.

185.    The actions of the Individual Defendants in falsely detaining, arresting, and imprisoning Plaintiff without reasonable suspicion or probable cause violated Plaintiff's rights under New York state law.

186.    In committing the acts alleged herein, each of the Individual Defendants were members and agents of the NYPD, acting at all relevant times within the scope of their employment.  The Defendant City of New York is accordingly liable as principal for all torts in violation of state law committed by its agents.

187.    Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above. Accordingly, Plaintiff is entitled to compensatory and punitive damages.

**Count Nine: Abuse of Process Under State Law**
*Against the City as respondeat superior, and the Individual Defendants*

188.    Plaintiff repeats and realleges paragraphs 1 through 187, as if fully set forth herein.

189.    The Individual Defendants, without proper excuse or justification, improperly utilized regularly issued judicial process to retaliate against Plaintiff.  In so doing, the Individual

Defendants intended to inflict harm on Plaintiff's person and to use process to obtain a collateral objective.

190.    In committing the acts alleged herein, each of the Individual Defendants were members and agents of the NYPD, acting at all relevant times within the scope of their employment.  The Defendant City of New York is accordingly liable as principal for all torts in violation of state law committed by its agents.

191.    Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above. Accordingly, Plaintiff is entitled to compensatory and punitive damages.

## Count Ten: Malicious Prosecution Under State Law
*Against the City as respondeat superior, and the Individual Defendants*

192.    Plaintiff repeats and realleges paragraphs 1 through 191, as if fully set forth herein.

193.    The Individual Defendants pressed charges against Plaintiff, while knowing the charges were baseless and lacked probable cause.  The proceedings were subsequently terminated in Plaintiff's favor, in a manner indicative of innocence.

194.    Statements made by the Individual Defendants to justify the charges against Plaintiff were made with the knowledge that those statements were false.  Defendants acted intentionally with malice and knowing disregard for Plaintiff's rights.

195.    In committing the acts alleged herein, each of the Individual Defendants were members of, and agents of, the NYPD, acting at all relevant times within the scope of their employment.  The Defendant City of New York is accordingly liable as principal for all torts in violation of state law committed by its agents.

196.     Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, including a loss of liberty, and of damages including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

### Count Eleven: Intentional Infliction of Emotional Distress Under State Law
*Against the City as respondeat superior, and the Individual Defendants*

197.     Plaintiff repeats and realleges paragraphs 1 through 196, as if fully set forth herein.

198.     The conduct of the Individual Defendants as described above was extreme and outrageous and constituted an abuse of their authority.  The Individual Defendants intended to cause, or recklessly disregarded the risk that their conduct would cause, severe emotional distress to Plaintiff.

199.     As a consequence of the Individual Defendants' conduct, Plaintiff has suffered ongoing and severe emotional distress, affecting her income and her well-being as described herein.

200.     In committing the acts alleged herein, each of the Individual Defendants were members and agents of the NYPD, acting at all relevant times within the scope of their employment.  The Defendant City of New York is accordingly liable as principal for all torts in violation of state law committed by its agents.

201.     Defendants' actions were the direct and proximate cause of Plaintiff's continued emotional distress.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

### Count Twelve: Negligent Infliction of Emotional Distress Under State Law
*Against the City as respondeat superior, and the Individual Defendants*

202.     Plaintiff repeats and realleges paragraphs 1 through 200, as if fully set forth herein.

203.    In committing the acts alleged herein, each of the Individual Defendants were members and agents of the NYPD, acting at all relevant times within the scope of their employment.  The Defendant City of New York is accordingly liable as principal for all torts in violation of state law committed by its agents.

204.    The Individual Defendants owed Plaintiff a duty of care, which was breached in the course of the conduct described herein.  The conduct of the Individual Defendants as described above was extreme and outrageous, resulting in a hospital stay as Plaintiff's blood pressure hit dangerously low levels as a direct result of the Individual Defendants' conduct.

205.    As a consequence of the Individual Defendants' breach of duty, Plaintiff has suffered ongoing and severe emotional distress, affecting her familial relationships, income, and her well-being as described herein.

206.    Defendants' actions were the direct and proximate cause of Plaintiff's continued emotional distress.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

## Count Thirteen: Trespass Under State Law
*Against the City as respondeat superior, and the Individual Defendants*

207.    Plaintiff repeats and realleges paragraphs 1 through 206, as if fully set forth herein.

208.    The Individual Defendants, without consent from Plaintiff, intruded into her home without a warrant, probably cause, or other legal justification.  Lacking a proper purpose, the Individual Defendants' entry into Plaintiff's home was not in the course of performing an official function.

209.    In committing the acts alleged herein, each of the Individual Defendants were members and agents of the NYPD, acting at all relevant times within the scope of their

employment.  The Defendant City of New York is accordingly liable as principal for all torts in violation of state law committed by its agents.

210.    Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, and of damages including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.  Accordingly, Plaintiff is entitled to compensatory and punitive damages.

**Count Fourteen:**
**Violation of Right to Be Free of Illegal Search and Seizure (New York City)**
N.Y.C. Administrative Code § 8-802
*Against the City as respondeat superior, and the Individual Defendants*

211.    Plaintiff repeats and realleges paragraphs 1 through 210, as if fully set forth herein.

212.    In committing the acts alleged herein, each of the Individual Defendants were employees of the NYPD, acting at all relevant times within the scope of their employment.

213.    Without a warrant, probable cause, or legal justification, the Individual Defendants engaged in an unlawful search of Plaintiff's home, including by entering the bedrooms and looking through personal belongings in closets.  At no point did Plaintiff consent to the search.

214.    To the extent the Individual Defendants were not directly involved in the unlawful search of Plaintiff's home, the Individual Defendants failed to intervene in the unlawful search.

215.    The Individual Defendants' conduct violated Plaintiff's rights under New York City law.

216.    Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, including a loss of liberty, and of damages including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.  Accordingly, Plaintiff is entitled to relief.

**Count Fifteen: Violation of Right to Be Free from False Arrest (New York City)**
N.Y.C. Administrative Code § 8-802
*Against the City as respondeat superior, and the Individual Defendants*

217.    Plaintiff repeats and realleges paragraphs 1 through 216, as if fully set forth herein.

218.    In committing the acts alleged herein, each of the Individual Defendants were employees of the NYPD, acting at all relevant times within the scope of their employment. Without a warrant, probable cause, or legal justification, the Individual Defendants falsely detained, arrested, and imprisoned Plaintiff against her will.  Plaintiff was conscious of, and at no point consented to, the confinement by the Individual Defendants.

219.    To the extent the Individual Defendants were not directly involved in the false arrest of Plaintiff, the Individual Defendants failed to intervene in the arrest.

220.    The Individual Defendants' conduct violated Plaintiff's rights under New York City law.

221.    Defendants' actions were the direct and proximate cause of violations of Plaintiff's constitutional, state, and other legal rights, including a loss of liberty, and of damages including pain, suffering, mental distress, anguish, humiliation, loss of income, and legal expenses as set forth above.  Accordingly, Plaintiff is entitled to relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby requests that the Court:

I.       Issue a judgment declaring that the conduct of the City of New York, through the NYPD and as described in this Complaint, constitute violations of Plaintiff's rights under the U.S. Constitution, federal law, the New York State Constitution, New York state law, and the New York City Administrative Code.

II.      Order injunctive relief to which Plaintiff is entitled;

III.     Award Plaintiff compensatory damages in an amount to be determined by a jury;

IV.     Award Plaintiff punitive damages arising from Defendants' actions;

V.      Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to 28 U.S.C. § 2414 and 42 U.S.C. § 1988; and

VI.     Grant such other and further relief as the Court deems just and equitable.

Dated: February 28, 2023
       New York, New York

Respectfully submitted,

/s/ Kshithij Shrinath

Kshithij Shrinath (Bar No. 5934997)
Anne Venhuizen (Bar No. 4790416)
Jenn Rolnick Borchetta (Bar No. 4339338)

THE BRONX DEFENDERS
360 E. 161st Street
Bronx, NY 10451
Phone: (718) 838-7878

*Counsel for Plaintiff Cheyenne Lee*

/s/ Lina Bensman

Lina Bensman (Bar No. 5028667)
Allison Kim (Bar No. 5741384)

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Counsel for Plaintiff Cheyenne Lee*